IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTINE PISTOR, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | Civil No. 05-4506 |
| v. | |
| TOMMY G. THOMPSON, Secretary of Health and Human Service, JO ANNE B. BARNHART, Commissioner of the Social Security Administration, | **OPINION** |
| Defendants. | |

APPEARANCES:

Mark Cimino, Esquire
1045 Cooper Street
Deptford, NJ 08096
     Attorney for Plaintiff


Christopher J. Christie
United States Attorney
     By:  Sixtina Fernandez
          Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
     Attorney for Defendant


**SIMANDLE**, District Judge:

This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g), to review the final decision of the Commissioner of the

Social Security Administration, denying the application of the

plaintiff, Christine Pistor, for Disability Insurance Benefits

under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Social Security Act.  42 U.S.C. § 401, et seq.  This Court must determine: (1) whether the Administrative Law Judge ("ALJ") properly determined Plaintiff's residual functional capacity and (2) whether the ALJ properly determined the functional capacity requirement of Plaintiff's former job.  For the reasons stated below, this Court will affirm the decision of the Commissioner that Plaintiff is "not disabled" and deny Plaintiff's appeal.


**I. Background**

    **A.    Procedural History**

On February 6, 2003, Plaintiff, Christine Pistor ("Plaintiff"), filed an application for a period of disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") alleging disability, for the period commencing on August 1, 2001, due to idiopathic dilated cardiomyopathy.  These applications were denied on initial consideration (Tr. at 13) and on reconsideration.  (Id.)  A hearing was requested and held before an Administrative Law Judge ("ALJ") on January 20, 2005.

ALJ Gerald J. Spitz issued a decision denying benefits on March 31, 2005.  ALJ Spitz held that Plaintiff had the severe impairments of cardiomyopathy and obesity.  Additionally, the ALJ held that Plaintiff's conditions, however severe, did not meet

2

the requirements for the Listing of Impairments, and that such an impairment would not prevent her from returning to her past work as a bank teller. (Tr. at 18.)

Plaintiff filed a request for review of the ALJ's decision to the Appeals Council on May 18, 2005. The request for further review was denied on July 18, 2005. Plaintiff then filed the present action with this Court on September 16, 2005.

**B. Evidence in the Record**

**1. Plaintiff's Testimony**

Plaintiff testified that she lived in a two-story house at 2 Briarwood Lane in Morristown, New Jersey, and that she was born on December 25, 1950. (Tr. at 30.) Plaintiff last worked as a bank teller for thirteen years at what is now Wachovia Bank. (Id.) Plaintiff was fired on October 25, 2000 after she failed to follow the procedure for reporting a shortage in her case drawer at the end of the day. (Tr. at 31-32.) Plaintiff searched for other work and enrolled in nursing school in the fall of 2001. (Tr. at 33.) Plaintiff did not return to school after her first semester due to the onset of her health problems. (Tr. at 34.)

Plaintiff testified that, at first, she thought she was "just getting old," and described the feeling that "everything [she] did was . . . so much harder for [her] then." (Tr. at 35.) She complained of not feeling well at the end of the day, being

tired and just wanting to go home and relax.  Plaintiff stated
that these feelings began towards the end of her employment with
Wachovia and may have contributed to her decision not to follow
procedure for reporting a shortage in her cash drawer.  (Id.)
Plaintiff claimed that she was tired all the time and experienced
frequent chest pains.  (Tr. at 36.)  She stated that she
continues to experience chest pains and feelings of fatigue.
(Tr. at 37).  Plaintiff also complained of arthritic shoulders,
on which she had surgery, and spinal problems.  (Tr. at 38).
Plaintiff stated that her heart condition has gotten worse since
she left work.  (Id.)

    Plaintiff testified that she resides with her parents, and
that she first wakes up at 5:30 AM to help her mother to the
bathroom and then back into bed.  (Tr. at 39.)  Plaintiff then
returns to bed until 7:30 AM, when she rises and prepares cereal
for herself and her mother.  Plaintiff stated that she used to
cook often, but now consumes mostly prepared meals or "something
that's easy like cereal and milk."  (Tr. at 40.)  After
breakfast, Plaintiff usually reads the paper, does the dishes and
prepares for her mother's occupational therapists.  (Id.)  For
lunch, Plaintiff usually prepares a sandwich or leftovers.  (Tr.
at 41.)  Plaintiff then stated that she rests from 3:00 PM until
5:00 PM, when she starts with dinner.  For dinner, Plaintiff
testified that she prepares pre-bagged salads and some sort of

prepared entree.  (Id).  Plaintiff then helps to clean up and rests until she retires for the evening.  (Tr. at 42.)

Plaintiff stated that she is able to do some chores, including housework and laundry, but must take frequent breaks. (Id.)  Plaintiff testified that it takes her an entire day to clean one room of the house and that she prefers to sit while she vacuums.  (Id.)  Plaintiff does not carry either laundry or the vacuum cleaner up or down stairs.  (Tr. at 42-43.)  Plaintiff claimed that she is no longer able to help with any of the outside chores.  (Tr. at 43.)

Plaintiff also described her responsibilities as a bank teller at her last place of employment.  Plaintiff stated that she frequently had to lift heavy boxes of coins.  (Tr. at 44.) Although she could not recall the exact weight of the boxes, she did recall that she had to pass a test requiring her to lift 50 pounds before she was hired.  (Tr. at 44-45.)  Plaintiff was also required to fill an ATM with boxes of cash weighing 10 to 15 pounds on a regular basis (Tr. at 46-47.)  Plaintiff was required to stand while in the presence of customers, which she stated was nearly all the time.  (Tr. at 44.)

Plaintiff testified that currently, she can work for only an hour-and-half until she has to rest, (Tr. at 50), and that she must rest from anywhere from 20 minutes to an hour after working for this amount of time.  (Id.)  Plaintiff stated that if she

over exerts herself, she experiences chest pains and shortness of breath.

### 2. Thomas McGuire's Testimony

Thomas McGuire testified that he has known Plaintiff for about 10 years. He stated that her condition has gotten progressively worse since he has known her and that Plaintiff can no longer go out like she used to. (Tr. at 53.) McGuire claimed to be present on one of the occasions on which Plaintiff over exerted herself and was forced to rest. (Id.) The ALJ asked no questions of McGuire.

### 3. Medical Reports

Plaintiff's primary complaint is cardiomyopathy.[1] Plaintiff first became concerned about possible heart problems because she had previously been treated with diet pills. (Tr. at 298.) A medical report by Dr. Maria D. Duca, dated July 9, 2001, states that Plaintiff presented with chest pain, dyspnea[2] and

---

[1] Cardiomyopathy is a disease of the myocardium. Plaintiff was eventually diagnosed with idiopathic dilated cardiomyopathy by Dr. Robert J. Schimenti. Idiopathic dilated cardiomyopathy is of unknown cause and is characterized by decreased function of the left ventricle. It is manifested by signs of overall cardiac failure as well as by fatigue. Stedman's Medical Dictionary 290 (Maureen Barlow Pugh et al. eds., 27th ed., Lippincott Williams & Wilkins 2000).

[2] Shortness of breath. Id. at 556.

palpitations.[3]  (Tr. at 145.)  The report also states that Dr. Duca performed an Echocardiogram ("Echo") at Dr. Joseph H. Winston's[4] request that showed some abnormalities.

Plaintiff was referred to Dr. Robert J. Schimenti, a cardiovascular specialist, for follow up care.  Dr. Schimenti first saw Plaintiff on August 20, 2001 at the referral of Dr. Winston.  At the visit, Plaintiff complained of chest discomfort unrelated to physical activity and shortness of breath, and increased perspiration with activity.  (Tr. at 293.)  Dr. Schimenti's report in the record dated October 2, 2001[5] confirms the findings of Plaintiff's initial tests and rates her ejection fraction ("EF") at 45 - 50%.  (Tr. at 166.)  A follow-up Electrocardiogram ("EKG") and cardiac catheterization were performed by Dr. Se Do Cha on October 26, 2001 and Plaintiff received a diagnosis of primary (idiopathic) cardiomyopathy. Plaintiff's EF was estimated at 30%.[6]  Dr. Cha recommended that

---

[3] Forcible or irregular pulsation of the heart, perceptible to the patient, usually with an increase in frequence or force, with or without irregularity in rhythm.  Id. at 1301.

[4] Dr. Winston is Plaintiff's primary care physician.

[5] Test date of September 28, 2001.

[6] The ejection fraction is the percentage of blood emptied from the ventricle during systole (when the heart contracts).  It is an estimate of how efficiently the heart functions.  Normal is considered to be between 60-70%.  Taber's Cyclopedic Medical Dictionary 671 (Donald Venes et al. eds., 20th ed. 2005).

Plaintiff begin drug therapy, lose weight and increase activity as tolerated.  (Tr. at 147-156.)

During the course of follow up care, Dr. Schimenti performed an Echo on March 21, 2003 which showed improved left ventricle systolic function and a "low/normal" ejection fraction of 50%. (Tr. at 174.)  Dr. Schimenti also had Plaintiff wear a Holter monitor[7] for the 24-hour period from March 20 - 21, 2003.  The monitor showed normal sinus rhythm for most of the time, and there were no changes in sinus rhythm during the times when Plaintiff complained of "dizziness and/or chest pain."  (Tr. at 176.)  In a report dated April 10, 2003,[8] Dr. Schimenti summarized the results of the two March tests, also noting that Plaintiff notices only "very rare lightheaded spells with significant activity."  (Tr. at 174-75.)  Subsequent tests by Dr. Schimenti from after March 21, 2003 to February 3, 2005 show an EF ranging from 40 - 50%.  At these visits, Plaintiff denied feeling lightheaded or experiencing syncope, near syncope, dyspnea or chest pain.[9]  (Tr. at 320, 323.)

---

[7] A long-term, continuous, usually ambulatory, recording of electrocardiographic signals on magnetic tape for scanning and selection of significant but fleeting changes that might otherwise escape notice.  Stedman's Medical Dictionary, supra note 1, at 1126.

[8] The reviewing physician for Social Security relied heavily on this report in producing his report, exhibit 7F.

[9] Syncope is a loss of consciousness and postural tone caused by diminished cerebral blood flow, fainting.  Stedman's

Dr. N. Abdelmeissen, a state agency physician, reviewed Plaintiff's medical records and opined on May 21, 2003 that Plaintiff had a residual functional capacity of "light," meaning that she was capable of standing for about 6 hours and sitting for about 6 hours of a normal workday, frequently lifting up to 10 pounds and occasionally lifting up to 20 pounds.  (Tr. at 187-195.)  Dr. Abdelmeissen specifically referred to Dr. Schimenti's report of April 10, 2003, (Tr. at 174), citing Plaintiff's improved left ventricle function and stress testing showing "reasonable functional capacity."[10]  (Tr. at 195.)

Plaintiff later visited another cardiologist, Dr. Steven Fox, for a consultation on September 28, 2004.  Dr. Fox was not in possession of Plaintiff's prior medical records at the time of this consultation and relied on information given to him by the Plaintiff.  (Tr. at 249.)  At the visit, Plaintiff complained of experiencing shortness of breath, increased fatigability and chest discomfort.  (Id.)  Dr. Fox diagnosed Plaintiff with cardiomyopathy and an EF less than 40%, (Tr. at 250), but it is unclear from the record whether he actually performed tests on Plaintiff or whether he relied solely on Plaintiff's statements in making the diagnosis.

---

Medical Dictionary, *supra* note 1, at 1745.

[10] Stress test was performed on March 25, 2003.  (Tr. at 165.)

9

Plaintiff's other physical complaints on the record include obesity, shoulder problems, spinal pain and a hernia. Plaintiff's Disability Report states that she is five feet six and one-quarter inches tall (5' 6 1/4") and weighs 200 pounds. (Tr. at 101.)  The ALJ observed that this puts her BMI[11] at 32.3 kg/m$^2$ which the National Institutes of Health define as obese. (Tr. at 17.)

Plaintiff's left shoulder was operated on in 1999 after Plaintiff had complained of chronic back pain for many years. (Tr. at 313.)  The record states that Plaintiff's results were "so wonderful" that she had the same surgery performed on her right shoulder in 2001.  (Tr. at 304.)  Dr. Joseph Farrell, who performed both surgeries, stated that Plaintiff's shoulder was "not giving her any trouble at all" at the time of her last visit in the record.  (Tr. at 301.)

Plaintiff first consulted Dr. Brill in regard to chronic lower back pain in November of 1998.  Dr. Brill found some degenerative changes as well as a bulging disc, facet hypertrophy and ligamentum flavum hypertrophy.[12] (Tr. at 315.)  Dr. Brill treated Plaintiff with two injections of epidural cortisone.

---

[11] Body mass index.  A ratio of height to weight used to measure the healthiness of a person's weight.  (Tr. at 17.)

[12] Indicative of mild osteoarthritis.  The Merck Manual of Diagnosis and Therapy 294-97 (Mark H. Beers et al. eds., 18th ed. 2006).

(Id.)  Plaintiff returned to Dr. Brill on May 9, 2001 complaining
of dorsal back pain.  Dr. Brill found some degenerative changes
in the mid thoracic area but concluded that this was not the
cause of Plaintiff's back pain.  Instead, he diagnosed Plaintiff
with dorsal back strain and prescribed an exercise program.  (Tr.
at 318.)

        Plaintiff first consulted Dr. Louis S. Ruvolo regarding a
possible hernia on September 28, 1998.  Dr. Ruvolo found no
evidence of a hernia in the epigastric area of the abdomen, but
possibly identified a small umbilical hernia.  (Tr. at 200.)
There is no follow up to this visit in the record.  Plaintiff
consulted with Dr. Jose A. Escalona on April 22, 2002 regarding a
hernia.  Dr. Escalona could not feel a true hernia, but due to
Plaintiff's size, recommended a CT scan.  (Tr. at 265.)  The
results of the CT scan are not in the record.  On August 31, 2004
Plaintiff visited Dr. Constantine T. Andrew complaining of a
hernia.  Dr. Andrew observed a large mass in the upper midline.
(Tr. at 251.)  Dr. Andrew planned to get a CAT scan but did not
recommend surgical intervention due to Plaintiff's heart
problems.  (Id.)  The results of the CAT scan are not in the
record.

        None of Plaintiff's physicians has ever stated that she is
disabled or unable to work, and both Dr. Cha and Dr. Brill
recommended that Plaintiff begin an exercise program.

11

## II. Discussion

### A.   Standard of Review

Under 42 U.S.C. § 405(g), Congress provided for judicial review of the Commissioner's decision to deny a complainant's application for Disability Insurance Benefits.  <u>Ventura v. Shalala</u>, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001); <u>Sykes v. Apfel</u>, 228 F.3d 259, 262 (3d Cir. 2000); <u>Williams v. Sullivan</u>, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial evidence means more than "a mere scintilla."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)(quoting <u>Consolidated Edison Co. V. NLRB</u>, 305 U.S. 197, 229 (1938)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Id.</u>  The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable.  <u>See</u> <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988).

A reviewing court has a duty to review the evidence in its totality.  <u>See</u> <u>Daring v. Heckler</u>, 727 F.2d 64, 70 (3d Cir. 1984).  "[A] court must 'take into account whatever in the record fairly detracts from its weight.'" <u>Schonewolf v. Callahan</u>, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting <u>Willbanks v. Secretary of Health</u>

12

& Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting

Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his

reasons for rejecting or discrediting competent evidence."  Ogden

v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing Brewster

v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third Circuit has

held that an "ALJ must review all pertinent medical evidence and

explain his conciliations and rejections," Burnett v. Comm'r of

Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000), and that

"there is a particularly acute need for some explanation by the

ALJ when s/he has rejected relevant evidence or when there is

conflicting probative evidence in the record."  Cotter v. Harris,

642 F.2d 700, 706 (3d Cir. 1981).

Similarly, an ALJ must also consider and weigh all of the

non-medical evidence before him.  Burnett, 220 F.3d at 122.

(citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983));

Cotter, 642 F.2d at 707.

The Third Circuit has held that access to the Commissioner's

reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all
> evidence and has sufficiently explained the
> weight he has given to obviously probative
> exhibits, to say that his decision is
> supported by substantial evidence approaches
> an abdication of the court's duty to
> scrutinize the record as a whole to determine
> whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).  A district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams, 970 F.2d at 1182.  However, an ALJ need not explicitly discuss every piece of relevant evidence in his decision.  See Fargnoli v. Massanari, 247 F.3d at 42.

Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Commissioner arrived at his decision by application of the proper legal standards.  Sykes, 228 F.3d at 262; Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).  However, a remand is not warranted when "it would not affect the outcome of the case."  Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005); see also Brown v. Barnhart, Civil Action No. 04-4679, 2006 WL 1479638 (E.D.Pa. May 23, 2006); Lyons v. Barnhart, No. Civ.A. 05-104, 2006 WL 1073076 (W.D.Pa. March 27, 2006); Cordovi v. Barnhart, No. Civ.A. 04-3742, 2005 WL 3441222 (E.D.Pa. Dec. 14, 2005).

**B.   Standard for Disability Insurance Benefits**

The Social Security Act defines "disability" for purposes of an entitlement to a period of disability and disability insurance benefits as the inability to engage in any substantial gainful activity by reason of any medically determinable physical and/or mental impairment which can be expected to result in death, or

14

which has lasted or can be expected to last for a continuous period of not less than 12 months.  See 42 U.S.C. §1382c(a)(3)(A).  Under this definition, a claimant qualifies as disabled only if his physical or mental impairments are of such severity that he is not only unable to perform his past relevant work, but cannot, given his age, education, and work experience, engage in any other type of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations for determining disability that require application of a five-step sequential analysis.  20 C.F.R. § 404.1520.  This five-step process is summarized as follows:

1.   If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."

2.   If the claimant does not suffer from a "severe impairment," he will be found "not disabled."

3.   If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."

4.   If the claimant can still perform work he has done in the past ("past relevant work") despite the severe impairment, he will be found "not disabled."

5.   Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional

15

> capacity"), age, education, and past work experience to
> determine whether or not he is capable of performing
> other work which exists in the national economy.  If he
> is incapable, he will be found "disabled."  If he is
> capable, he will be found "not disabled."

20 C.F.R. § 404.1520(b)-(f).  Entitlement to benefits is

therefore dependent upon a finding that the claimant is incapable

of performing work in the national economy.

This five-step process involves a shifting burden of proof.

Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150,

1153 (3d Cir. 1983).  In the first four steps of the analysis,

the burden is on the claimant to prove every element of his claim

by a preponderance of the evidence.  Id.  In the final step, the

Commissioner bears the burden of proving that work is available

for the plaintiff: "Once a claimant has proved that he is unable

to perform his former job, the burden shifts to the Commissioner

to prove that there is some other kind of substantial gainful

employment he is able to perform."  Kangas v. Bowen, 823 F.2d

775, 777 (3d Cir. 1987).  See Olsen v. Schweiker, 703 F.2d 751,

753 (3d Cir. 1983).

Here, ALJ Spitz determined that Plaintiff has not been under

a disability, as defined in the Social Security Act as amended,

at any time since her alleged onset date of disability, i.e.,

January 30, 2002, through the date of the decision.  At step one,

the ALJ found that Plaintiff has not engaged in substantial

gainful activity since the alleged onset of disability.  (Tr. at

16

18.)  At step two, he found that Plaintiff's impairments of
cardiomyopathy and obesity  are severe impairments per 20 C.F.R.
§ 404.1520 and § 416.920.  (Id.)  However, the ALJ determined at
step three that these impairments did not meet or medically equal
one of the listed impairments in Appendix 1, Subpart P,
Regulation No. 4.  (Id.)  At step four, the ALJ found that
Plaintiff retains the residual functional capacity to perform a
job requiring light exertion and that performance of Plaintiff's
past relevant work as a bank teller, as it is generally performed
in the national economy, is not precluded by her residual
functional capacity.  20 C.F.R. §§ 404.1516 and 416.965.
Therefore, Plaintiff is not "disabled."  (Id.)

    **C.  Plaintiff's Arguments**

Plaintiff's brief lists four arguments against the ALJ's
finding that Plaintiff is not eligible for disability benefits or
supplemental income.  First, Plaintiff argues that the ALJ did
not fully address all the medical evidence in making the decision
that Plaintiff retained the residual functional capacity to
perform light work.  Specifically, Plaintiff claims that the ALJ
did not adequately explain his rejection of the medical evidence
that consistently estimated her EF in a range lower than that
found by Dr. Schimenti.  (Pl. Br. at 6.)  Second, Plaintiff
claims that the ALJ did not sufficiently explain why he rejected
Plaintiff's testimony as not credible.  (Pl. Br. at 8.)  Third,

Plaintiff argues that the case must be remanded because the ALJ did not even mention Thomas McGuire's corroborations of Plaintiff's testimony.  (Id.)  Fourth, Plaintiff argues that the ALJ erred in finding that Plaintiff's past relevant work as a bank teller was "light."  (Pl. Br. at 10.)

### 1. __The ALJ's determination that Plaintiff's residual functional capacity was "light exertion."

The ALJ found that Plaintiff has the residual functional capacity "light work."  (Tr. at 17.)  Plaintiff argues that the ALJ omitted evidence regarding the severity of her condition, specifically that he did not explain how Dr. Andrew's and Dr. Fox's reports, which found Plaintiff's EF to be lower than that reported by Dr. Schimenti, factored into his decision.  Dr. Constantine Andrew examined Plaintiff and stated that Plaintiff's EF was estimated at 35%.  (Tr. at 251.)  Dr. Steven Fox examined Plaintiff and noted that Plaintiff had an EF of less than 40%.  (Tr. at 249.)  It is Plaintiff's contention that these reports contradict the findings of Dr. Schimenti, and that the failure to mention how they factored into the ALJ's evaluation of Plaintiff's residual functional capacity precludes affirming the decision.

Plaintiff was examined by Dr. Andrew on September 16, 2004 after she complained of a hernia.  Dr. Andrew noted that Plaintiff's EF was 35%.  There is nothing in the record that indicates whether Dr. Andrew relied on Plaintiff's medical

18

history or statements or his own tests to arrive at that figure.
Dr. Steven Fox examined Plaintiff, apparently during a cardiology
consultation, on September 28, 2004 and noted that Plaintiff had
an EF of less than 40%.  Again, nothing in the record, other that
Dr. Fox's notation that he did not possess Plaintiff's medical
records, indicates how he made this determination. Neither Dr.
Andrew nor Dr. Fox submitted anything in the record opining on
Plaintiff's ability to work.

The ALJ did specifically mention Dr. Andrew's and Dr. Fox's
reports in his opinion.  (Tr. at 15.)  Although he did not refer
to either report in the paragraph in which he concludes that
Plaintiff's residual functional capacity is "light work," he does
state that he considered "all of the foregoing [evidence]."  The
ALJ wrote that the most consideration was given to Exhibit 7F and
to the notes of Dr. Schimenti, and the Court has said that the
ALJ need not explicitly discuss every piece of relevant evidence
in his decision.  See Fargnoli, 247 F.3d at 42.

According to the Social Security Administration's
guidelines, more weight is given to evidence presented by a
claimant's treating physician.  See 20 C.F.R. § 404.1527(d)(2).
The Third Circuit has long held that "[a] court considering a
claim for disability benefits must give greater weight to the
findings of a treating physician." Mason v. Shalala, 994 F.2d
1058, 1067 (3d Cir. 1993).  When a treating physician's opinion

19

is not given controlling weight, the length of the treatment relationship, the frequency of examination, nature and extent of the treatment relationship, and the supportability, consistency and specialization that the claimant or other brings to the ALJ's attention are all factors in deciding how much weight the Court must give to the treating physician's opinion.  See 20 C.F.R. § 404.1527(d)(2)-(6).

Plaintiff's treating physicians are Drs. Winston, Schimenti, Fox and Andrew.  (Tr. at 15, 124.)  Exhibit 7F is a report based on review of medical records by Dr. Abdelmeissen, and supported by the notes of Dr. Schimenti.  The reports of Dr. Andrew and Dr. Fox seem to contradict the report of Dr. Schimenti regarding Plaintiff's EF.  However, Dr. Schimenti's reports would properly be given more weight than those of Drs. Andrew and Fox based on the factors in 20 C.F.R. § 404.1527(d)(2)-(6).

On the one hand, through step four of the evaluation process, the burden is on Plaintiff to prove what residual functional capacity she retains and that she cannot return to her relevant past work.  Plaintiff has submitted evidence from a number of treating physicians that indicates that her EF is lower than that recorded by Dr. Schimenti and relied on my Dr. Abdelmeissen in producing Exhibit 7F.  However, Plaintiff has not submitted evidence regarding how Drs. Andrew and Fox obtained their EF numbers or how this discrepancy might affect her

20

residual functional capacity.  Additionally, Dr. Schimenti's
latest evaluation of Plaintiff, on February 8, 2005, post-dates
the evaluations of Drs. Andrew and Fox.  In his report, Dr.
Schimenti states that Plaintiff "is asymptomatic from a
cardiovascular perspective. . . . [S]he feels better.  She offers
no complaints of orthopnea, PND,[13] chest paint or shortness of
breath," and rates her EF at 40 - 45%.  In sum, no physician has
stated that Plaintiff "was disabled for any reason, let alone on
the basis of her ejection fraction results."  (Def. Br. at 7.)
In fact, two of Plaintiff's physicians, Dr. Cha and Dr. Brill,
recommended that Plaintiff begin an exercise regimen.  (Tr. at
148, 318.)

     Although the ALJ does not specifically state how the reports
of Drs. Andrew and Fox factored into his decision, substantial
evidence in the record, provided by Dr. Schimenti (one of
Plaintiff's treating physicians), supports the ALJ's finding that
Plaintiff retained the functional capacity to do light work.[14]

---

     [13] Orthopnea and PND are types of shortness of breath.
Stedman's Medical Dictionary, *supra* note 1, at 556.

     [14] There is one factor in particular that lends weight to
Plaintiff's argument; the ALJ relied heavily on Exhibit 7F when
determining that Plaintiff is capable of performing light work.
This report was produced by a non-examining physician and thus is
of less weight in determining Plaintiff's functional capacity.
However, even though Plaintiff's EF is lower as estimated by Drs.
Andrew and Fox, neither specifically contradicts the
determination of Plaintiff's residual functional capacity.

### 2.   The ALJ's determination that the non-medical evidence offered by Plaintiff was not credible.

This Court declines to substitute its own determination of credibility for that of the ALJ, given that the ALJ had the opportunity to observe Plaintiff and her testimony first-hand. See Wier v. Heckler, 734 F.2d 955, 962 (3d Cir. 1984) (recognizing that great deference is given to ALJ's determination of credibility).  It is within the ALJ's discretion "'to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.'" Brown v. Schweiker, 562 F. Supp. 284, 287 (E.D. Pa. 1983) (quoting Bolton v. Secretary of Health & Human Servs., 504 F. Supp. 288, 291 (E.D.N.Y. 1980)).

A Social Security Ruling states the importance of explaining the reasons for the finding about credibility in and ALJ's decision:

> It is not sufficient for the adjudicator to make a single, conclusory statement that . . . "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p.[15]  An example of a valid credibility determination is
an ALJ's consideration of the fact that a claimant has not sought
medical treatment for pain, See Mason v. Shalala, 994 F.2d 1058,
1068 (3d Cir. 1992), or that a claimant is not taking medication
that was prescribed for pain.  See Welch v. Heckler, 808 F.2d
264, 270 (3d Cir. 1986).

In making his residual functioning capacity analysis, the
ALJ stated in his findings that "the claimant's allegations
regarding her limitations are not totally credible for the
reasons set forth in the body of the decision."  (Tr. at 18.)
The ALJ's decision contains only a summary of the medical
evidence submitted by her physicians, the Plaintiff's testimony
and the evidence regarding the required functional capacity of a
financial teller as found in the Dictionary of Occupational
Titles.

However, the ALJ's summary of Plaintiff's testimony
immediately follows the medical evidence that the ALJ considered.
It is reasonable to assume that Plaintiff's testimony is to be
compared and contrasted with the evidence provided by her
physicians.  Based on this comparison, Plaintiff's testimony is

---

[15] See also George v. Barnhart, No. 03-875-KAJ, 2004 WL
2501878, (D.Del. Nov. 2, 2004) (holding that although ALJ's
statement could be viewed as conclusory, the determination of
credibility would not be remanded because it the ALJ's opinion
also extensively discusses the objective evidence of record that
her decision was based on and because the determination is
supported by substantial evidence).

not supported by medical evidence, which states that Plaintiff is
"asymptomatic from a cardiovascular perspective."  (Tr. at 16.)
Additionally, none of Plaintiff's physicians has ever stated that
she is disabled or unable to work, and two have recommended that
she increase activity or exercise, a recommendation seemingly
inconsistent with a disability that would preclude the
performance of "light work."  (Tr. at 147, 318.)

Although the ALJ should have explicitly cited reasons for
reaching his conclusion, the clear though implicit conclusion is
that the Plaintiff's testimony lacks corroboration in the medical
evidence, which is supported by substantial evidence.  Also,
because remand is not likely to alter the outcome of the case, it
is not warranted on this point.  See Rutherford, 399 F.3d 546 at
553 (refusing to remand where stricter compliance with a social
security ruling would not have changed the outcome of the case).

### 3.   Failure to consider or address the testimony of Plaintiff's witness, Thomas McGuire.

Plaintiff argues that the ALJ's opinion fails to address the
testimony of Thomas McGuire, Plaintiff's companion for
approximately ten (10) years.  An ALJ must consider and weigh all
of the non-medical evidence before him.  See Burnett, 220 F.3d at
122.  Again, however, an ALJ need not explicitly discuss every
piece of relevant evidence in his decision.  See Fargnoli 247
F.3d at 42.  The ALJ did not explicitly discuss the testimony of
Mr. McGuire, Plaintiff's best friend (also referred to as her

24

companion) who testified on her behalf.  (Tr. at 52-53.)  Even if this case were remanded with an order to fully elaborate on Mr. McGuire's testimony, the evidence he presented is not inconsistent with the ALJ's decision.

Mr. McGuire testified on January 20, 2005 that Plaintiff has trouble when she "tries to do something she's not supposed to be doing," and that her condition has deteriorated since he first met her.  This is cumulative to Plaintiff's testimony that she needs assistance when caring for her mother, carrying the laundry baskets, or working outside.  Because the ALJ discounted Plaintiff's testimony as incredible, McGuire's testimony supporting that of the Plaintiff is encompassed in that determination.

Furthermore his account of Plaintiff's trouble lifting heavy objects and going up and down stairs, even if accorded full credibility, is not enough to establish that Plaintiff is precluded from engaging in some substantial gainful activity.

Accordingly, in light of the evidence on record and despite a lack of elaboration, there is no indication that the ALJ impermissibly excluded Mr. McGuire's testimony from consideration.  Instead, the ALJ accorded it no weight, as also shown by the ALJ's decision to ask him no questions at the hearing after observing his direct testimony.  Again, the Third Circuit's decision in <u>Rutherford</u> indicates that, because further

consideration of and elaboration on McGuire's testimony would not alter the outcome of the determination, there is no reason to remand. See Rutherford, 399 F.3d 546 at 553 (refusing to remand where stricter compliance with a social security ruling would not have changed the outcome of the case).

### 4.   Whether Plaintiff is capable of performing relevant past work as a bank teller

As explained above, the ALJ's determination that Plaintiff has not established a severe impairment that prevented her from performing "light" work was supported by a substantial evidence. However, Plaintiff argues that the ALJ erred in finding that she was capable of performing her past relevant work as a bank teller "as it is generally performed in the national economy." (Tr. at 18.) Citing Burnett, Plaintiff states that it is "clear error to make a past relevant work determination that is contrary to uncontroverted evidence presented by the claimant." Burnett, 220 F.3d 112 at 123. However, the facts in this case are easily distinguished from those in Burnett, and Plaintiff's evidence is not "uncontroverted."

In Burnett, the claimant's past work was not listed in the Dictionary of Occupational Titles ("DOT"). Her testimony stated that she was a deli clerk and that she "lifted a maximum of 50 pounds at a time, frequently lifted 25 pounds, constantly had to bend, cut and wrapped cheese, and used a slicer to clean cheese." Id. at 124. This description would have qualified claimant's

26

work as "medium."  The ALJ did not find a listing for "deli clerk" in the DOT and thus approximated her description to "deli cutter/slicer," an occupation that was classified as "light."

In the case at hand, Plaintiff stated that she was previously a "bank teller."  Although the ALJ found this term synonymous with "financial teller," a job that he found in the DOT, the correct DOT job listing is "teller" in a "financial institution."  See DICOT 211.362-018.  The DOT classifies the position of "teller" as "light work."  Id.  The accompanying description states that a "teller" "[r]eceives and pays out money, and keeps records of money and negotiable instruments involved in financial transactions," "[b]alances currency, coin, and checks in cash drawer at end of shift, using calculator, and compares totaled amounts with data displayed on computer screen" and "[m]ay remove deposits from, and count and balance cash in, automated teller machines and night depository."  Id.  This description matches almost exactly Plaintiff's own testimony as to her job requirements as a teller, although Plaintiff testified that at times she was required to perform duties that would classify as "medium."

In order for the ALJ to properly find that Plaintiff may return to her past relevant work, he need not show that she might return to her previous job, only that she is capable of performing the "functional demands and duties of the job as is

27

generally required by employers throughout the national economy."
(Def. Br. at 11.)  20 C.F.R. § 404.1520(e).  *See e.g.* SSR 81-61;
Jock v. Harris, 651 F.2d 133 (2d Cir. 1981); Evans v. Shalala, 21
F.3d 832 (8th Cir. 1994).  The description of a job in the DOT
constitutes substantial evidence.  20 C.F.R. § 404.1566(d)(1);
Acosta v. Barnhart, 142 Fed. Appx. 613, 617 (3d Cir. 2005);
Evans, 21 F.3d 832 at 834.

     Although the ALJ incorrectly described the DOT listing of
"teller" in a "financial institution" as "financial teller"
(while Plaintiff states that she was a "bank teller"), his
conclusion that Plaintiff is capable of returning to her past
relevant work is supported by substantial evidence.  The job of
"teller" in a "financial institution" is the same occupation that
Plaintiff calls "bank teller."   This job, as described in the
DOT, classifies as "light work."  Although Plaintiff's particular
previous employment may have required her to occasionally lift
more weight that is listed under "light work," the ALJ's
determination that she could return to work as a "teller" as the
occupation is performed "throughout the national economy" was
based on substantial evidence that contradicted Plaintiff's
testimony.

     Substantial evidence and an adequate rationale support the
determination that Plaintiff is capable of returning to previous

work as is generally performed in the national economy, and thus the ALJ's decision is not a valid basis for remand.

III.  **<u>CONCLUSION</u>**

For the reasons stated above, the Commissioner's finding that Plaintiff is "not disabled" and is capable of performing her past relevant work will be affirmed.


**<u>August 7, 2006</u>**                    **<u>s/ Jerome B. Simandle</u>**
DATE                            JEROME B. SIMANDLE
                                United States District Judge